Filed 9/22/20  Rowan v. Hilliard CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MARY ANN ROWAN, as Trustee, etc., et al., | D075779 |
| Plaintiffs, Cross-defendants, and Appellants, | |
| v. | (Super. Ct. No. |
| CARL B. HILLIARD, JR., as Trustee, etc., et al., | 37-2018-00006776-CU-BC-CTL) |
| Defendants, Cross-complainants, and Respondents. | |

APPEAL from a judgment of the Superior Court of San Diego County, Richard S. Whitney, Judge.  Reversed.

Blackmar, Principe & Schmelter and Timothy D. Principe for Plaintiffs, Cross-defendants and Appellants.

Devaney Pate Morris & Cameron and William C. Pate for Defendants, Cross-complainants and Respondents.

Plaintiffs and appellants Mary Ann Rowan and Drew F. Sprague, trustees of The Sprague and Rowan Living Trust dated August 30, 2000, appeal a summary judgment entered in favor of defendants and respondents

Carl B. Hilliard, Jr. and Sharon E. Hilliard, as trustees of The Hilliard Family Trust Number One UTD September 26, 1991, on plaintiffs' action arising from defendants' placement of a flag pole on their own property, allegedly obstructing plaintiffs' views. The parties, who own homes on neighboring lots, filed competing summary judgment motions to either enforce or invalidate two recorded declarations of restrictions containing, among other covenants, height restrictions against one property in favor of the other. Ruling both declarations unenforceable, the trial court granted defendants' motion and denied plaintiffs' motion.

Plaintiffs contend the court erred by making inconsistent factual and legal findings as to the property's ownership, disregarding rules of priority established by recording laws, and failing to consider contrary evidence and inferences in their favor. Plaintiffs further contend the motions presented competing evidence and inferences and thus factual disputes inappropriate for summary judgment. Finally, plaintiffs contend both declarations are enforceable as equitable servitudes.

We conclude on this record defendants did not meet their burden of demonstrating they are entitled to judgment as a matter of law on the enforceability of the declarations, which turns on the properties' ownership and delivery of a deed to defendants' predecessors. A grantor's intent to deliver a deed is the critical issue and quintessentially a factual question. Though the summary judgment papers are based on a set of documents whose dates, contents and recording are not in dispute, they nevertheless allow differing inferences of the grantor's intent or lack of intent to deliver the deed, requiring determination by a trier of fact. We reverse the summary judgment.

2

FACTUAL AND PROCEDURAL BACKGROUND

We take the undisputed material facts from the parties' moving and opposing papers and state other facts and inferences from them in the light most favorable to plaintiffs. (Code Civ. Proc., § 437c, subd. (c); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.)

*The Properties*

Plaintiffs own property on Owen Street in the Point Loma area of San Diego (the Owen property). Defendants since mid-2014 have owned property on San Antonio Street (the San Antonio Property). The properties, both with single family residences on them, are located across the street from one another.

*The Deeds and Declarations*

The relevant documents pertaining to the properties are not in dispute. We recite the undisputed facts chronologically as reflected in the documents and the parties' separate statements.

In November 1978, two individuals signed a grant deed conveying the Owen property to Real Property Trust Deed Corporation (RPTDC).[1] That deed was recorded in January 1979.

In January 1980, two other individuals signed a grant deed conveying the San Antonio property to RPTDC. That deed was recorded the following month.

In February 1980, RPTDC's president John McCloskey signed a corporation grant deed conveying RPTDC's interest in the San Antonio

---

[1] Defendants presented RPTDC's 1959 articles of incorporation describing its business as "to issue forms for, and act as Trustee under deeds of trust given solely for the purpose of securing obligations for the repayment of money, other than corporate bonds . . . ." Plaintiffs presented evidence that more recently, RPTDC described its business as "Reconveyances, Qualified Intermediary for Exchanges."

property to Thomas Clarke Kravis and Mavourneen F. O'Connor (Kravis/O'Connor). About a month later, in March 1980, Kravis/O'Connor on the one hand as covenantors, and Robert Peterson and Maureen O'Connor (Peterson/O'Connor) on the other as covenantees, signed a declaration of restrictions stating their intent to subject the San Antonio property to specified conditions and restrictions for the benefit of the Owen property. That declaration contained a provision barring structures on specified portions of the San Antonio property and imposed height limitations for structures built on other areas.[2] The declaration was recorded on March 28, 1980 (the March 1980 declaration).

Weeks later, in April 1980, RPTDC's president McCloskey signed another declaration of restrictions reciting that RPTDC was the legal record owner of both the San Antonio and Owen properties and it agreed to be bound by the March 1980 declaration as if it had been a party and signatory to it (the April 1980 declaration). McCloskey signed that declaration on RPTDC's behalf as both covenantor and covenantee. The April 1980 declaration appended the March 1980 declaration, incorporated it by reference, and stated the conditions and restrictions "shall operate as covenants running with the land." The April 1980 declaration was recorded on April 10, 1980.

---

[2]     The March 1980 declaration provides in part: "Except with prior written consent of [Peterson/O'Connor], no structure shall be permitted to remain, be placed or be constructed on the [San Antonio property], except that on the north 46 feet of the subject property a structure not exceeding the height of 36.72 feet above mean sea level according to United States Coast and Geodedic [*sic*] Survey datum shall be permitted, and on the south 38 feet of the subject property a structure not exceeding the height of 24.46 feet above mean sea level according to United States Coast and Geodedic [*sic*] Survey datum shall be permitted."

It was not until February 1981 that the February 1980 deed conveying the San Antonio property from RPTDC to Kravis/O'Connor was recorded.

In April 1982, RPTDC's president signed a corporation grant deed transferring RPTDC's interest in the Owen property to Robert O. Peterson, as trustee of a trust. That deed was recorded in June 1982. The deed does not reference the declarations. The Owen property was transferred to Peterson/O'Connor in 1985.[3]

In April 2004, Kravis/O'Connor signed a grant deed conveying the San Antonio property to Veronica Engle, whose trust in July 2014 conveyed that property to defendants. Both grant deeds were recorded in the month after they were signed. Defendants learned of the declarations in June 2014 before escrow closed on the San Antonio property.

*Defendants' Flagpole and the Present Litigation*

Defendants erected a flagpole exceeding the height limitations contained in the April 1980 declaration. Plaintiffs sued defendants, eventually filing a second amended complaint for declaratory and injunctive relief as well as breach of contract. They sought a judicial determination of the enforceability of the declarations, a permanent injunction enforcing the height restriction on the basis of an equitable servitude, and an award of breach of contract damages for defendants' violation. Defendants filed a cross-complaint seeking a judicial declaration that the March and April 1980 declarations were unenforceable, did not impose height restrictions on their property, and that plaintiffs had no right to enforce them. They also sought

---

[3]     Defendants assert in their motion that plaintiffs purchased the property in January 2003. The record does not contain evidence of that transaction.

to quiet title against the plaintiffs' claims and cancellation of the declarations.

The parties filed competing summary judgment motions. In part, defendants argued the declarations did not constitute enforceable covenants under Civil Code[4] section 1468 and plaintiffs could not raise a triable issue of material fact demonstrating to the contrary. They maintained the March 1980 declaration was invalid under section 1468, requiring an enforceable covenant to be made between owners of land, because Peterson/O'Connor did not own the Owen property at the time they signed the declaration, and did not take title to the property until March 1985. Defendants argued the April 1980 declaration likewise was unenforceable because RPTDC was not the owner of the San Antonio property when its president signed it, as by then (in February 1980) RPTDC had transferred the property to Kravis/O'Connor. They argued the later recording did not matter because under section 1055 the deed was presumed delivered as of the date it was signed. Finally, defendants argued that even if RPTDC owned the San Antonio property in April 1980, the April 1980 declaration was still not enforceable because land restrictions had to be made by separate owners, and could not be created unilaterally by a single landowner.

Plaintiffs argued the dispositive issue for enforcing the declarations was the fact they were enforceable as equitable servitudes. They pointed out defendants had notice of the declarations with their height restrictions when they purchased the San Antonio property, and section 1468 was irrelevant. Relying on *Citizens for Covenant Compliance v. Anderson* (1995) 12 Cal.4th 346, 349-350 (*Citizens*), plaintiffs argued that equitable servitudes could be created between two or more parcels by a common owner, and the deed did

---

4    Undesignated statutory references are to the Civil Code.

not need to mention the restrictions, which " 'spring into existence' " when the first conveyance is made subject to them. According to plaintiffs, if the conveyance was made after the restrictions were recorded, the purchaser was "deemed to agree with them." Under these rules, plaintiffs' argued, the servitude burdening the San Antonio property sprang into existence when legal record ownership passed to Kravis/O'Connor in 1981, and defendants purchased the property in 2014 with notice of their existence.

The trial court granted defendants' motion and denied plaintiffs' motion. It ruled the grant deed signed in February 1980 was presumed delivered when it was signed, and not later, and that plaintiffs' assertion was unsupported by evidence. It ruled neither declaration was valid, finding Peterson/O'Connor did not own the Owen property on March 28, 1980, when they signed the March 1980 declaration and RPTDC had already conveyed the San Antonio property to Kravitz/O'Connor when it's president signed the April 1980 declaration. The court ruled plaintiffs did not overcome a presumption that that grant deed was delivered such that RPTDC no longer had any interest, rendering the April 1980 declaration invalid. On the plaintiffs' claim that the declarations were enforceable as equitable servitudes, the court found they did not comply with sections 1462 or 1468, they did not contain covenants that were mutually beneficial to a common plan, and it would be inequitable to enforce the restrictions when they only benefitted the Owen property. It rejected plaintiffs' suggestion that the March 1980 declaration was incorporated nunc pro tunc into the April 1980 declaration, or that RPTDC acted as a trustee, ruling "Plaintiffs have not provided evidence as to what was actually intended nor authority that RPTDC, or any other entity or person, could alter the effect of recorded documents without having an ownership interest or being a trustee." The

7

court stated plaintiffs did not submit evidence of a clerical error rather than a substantive error in choice.

Plaintiffs filed this appeal from the ensuing judgment.

DISCUSSION

I. *Defendants' Claims of Retraxit, Res Judicata and Collateral Estoppel*

We begin with defendants' procedural attacks on plaintiffs' arguments. They first urge us to disregard them on grounds they present new facts and an entirely new theory not developed or factually presented in the trial court, which cannot create a triable issue of fact on appeal. These new facts, according to defendants, are that the parties to the March 1980 declaration were the putative beneficial owners of both properties, and the deed to Kravis/O'Connor was not delivered until it was recorded in February 1981. The asserted new theory is that the declarations are a conveyance of a property interest and part of the chain of title. Defendants rely on *Expansion Pointe Properties Limited Partnership v. Procopio, Cory, Hargreaves & Savitch, LLP* (2007) 152 Cal.App.4th 42, 54 [" '[I]n reviewing a summary judgment, the appellate court must consider only those facts before the trial court, disregarding any new allegations on appeal. [Citation.] Thus, *possible theories that were not fully developed or factually presented* to the trial court cannot create a "triable issue" on appeal' "].)

Defendants are correct that on appeal from a summary judgment, a party is not permitted to change positions and adopt new and different theories, including new attacks on the evidence. (*Schmidt v. Citibank, N.A.* (2018) 28 Cal.App.5th 1109, 1125; *DiCola v. White Brothers Performance Products, Inc.* (2008) 158 Cal.App.4th 666, 676.) " 'To permit [a party] to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant.' " (*DiCola*, at p. 676.) We agree some theories newly raised

8

by plaintiffs in this appeal cannot be considered.  We disagree, however, that plaintiffs' appeal presents new facts or evidence.  All of the relevant documents were before the trial court on the competing summary judgment motions.  The contents of the deeds and declarations, as well as the dates they were signed and recorded, are undisputed.  The validity of the declarations in part turns on what inferences, if any, can be drawn from the underlying undisputed facts, which is a question of law.  (*Willis v. Gordon* (1978) 20 Cal.3d 629, 633 [" '[w]hether a particular inference *can* be drawn from certain evidence is a question of law' "]; *Marshall v. Parkes* (1960) 181 Cal.App.2d 650, 655; *Hennelly v. Bank of America Nat. Trust & Savings Assn.* (1951) 102 Cal.App.2d 754, 758.)  And "summary judgment may not be granted by the court based on inferences reasonably deducible from the evidence, if contradicted by other inferences or evidence, which raise a triable issue as to any material fact."  (§ 437c, subd. (c).)

The question of effective delivery of the grant deeds was squarely raised by defendants in their summary judgment motion, and the trial court ruled on the issue.  In their summary judgment papers plaintiffs argued title to Kravis/O'Connor transferred not upon signing of the deed, but in February 1981 when the deed was recorded.  As counsel put it at oral argument below speaking of the declarations:  "[T]he record of an instrument purporting to effect an interest in property is prima facie evidence of its existence and its execution and delivery."  Plaintiffs further argued the April 1980 declaration "affect[ed] title to real property" and thus was an enforceable " 'conveyance' " of which the defendants had constructive notice.  In sum, these facts and arguments presented in plaintiffs' opening brief are not new or inconsistent with their positions taken in the trial court.

We reject defendants' claim that plaintiffs are barred by "collateral estoppel and/or res judicata" from raising these arguments. This claim is premised on the theory that plaintiffs should have, but did not, appeal from the order *denying* plaintiffs' summary judgment motion and dismissing their action with prejudice, and that plaintiffs' "voluntary action of not appealing an order of dismissal with prejudice has the same effect" as a dismissal with prejudice, which is a judgment on the merits having res judicata effect. The argument borders on the frivolous. It confusingly treats the doctrines of res judicata and collateral estoppel interchangeably.[5] It misunderstands the doctrines, both of which arise in *second suits* between the same parties or person in privity to give preclusive effect to claims made or issues argued in prior lawsuits. (*DKN Holdings LLC v. Faerber*, *supra*, 61 Cal.4th at p. 824.) There is no second or successive suit here. And plaintiffs *did* in fact appeal from the final judgment entered on defendants' motion dismissing plaintiffs' action with prejudice. They could not have appealed any order denying summary judgment, which is not an appealable final judgment for purposes of either claim or issue preclusion. (See *Gietzen v. Covenant RE Management, Inc.* (2019) 40 Cal.App.5th 331, 338; *Salehi v. Surfside III Condominium Owners' Assn.* (2011) 200 Cal.App.4th 1146, 1158.)

There is likewise no merit to defendants' claim of retraxit, which is akin to the meritless claim preclusion argument. " 'Retraxit' describes the

5     The California Supreme Court clarified in *DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813 that "[c]laim preclusion, the ' " 'primary aspect' " ' of res judicata, acts to bar claims that were, or should have been, advanced in a previous suit involving the same parties. [Citations.] Issue preclusion, the ' " 'secondary aspect' " ' historically called collateral estoppel, describes the bar on relitigating issues that were argued and decided in the first suit." (*Id.* at pp. 823-824; see also *Kim v. Reins International California, Inc.* (2020) 9 Cal.5th 73, 91 [claim preclusion was "formerly called res judicata"].)

10

particular application of claim preclusion to a claim that has been dismissed with prejudice." (*Kim v. Reins International California, Inc.*, *supra*, 9 Cal.5th at p. 91.) Defendants argue plaintiffs' issues and arguments are barred by retraxit on grounds that during oral argument on the motions below plaintiffs' counsel renunciated any claim that the March and April declarations were valid covenants running with the land. As plaintiffs point out in reply, this premise, based on a snippet of counsel's remarks, mischaracterizes the record.[6] The argument fails in any event in that there is no second lawsuit in which to apply the doctrine. (*Kim*, at p. 92.)

II. *Propriety of Summary Judgment*

A. *Summary Judgment Standards*

Section 437c provides that a motion for summary judgment shall be granted "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (§ 437c, subd. (c); *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618.)

"A defendant who moves for summary judgment bears the initial burden to show the action has no merit—that is, 'one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action.' [Citation.] 'Once the

---

6 Counsel conceded that at the time RPTDC owned both parcels, the April 1980 declaration could not constitute a covenant running with the land, but he argued it was nonetheless valid as an equitable servitude: "What happens when that occurs [a restriction does not constitute a covenant running with the land due to its creation by a single owner]? You have equitable servitudes. That is what steps up and says, 'If there's some sort of deficiency in this, an equitable servitude will apply.' " In fact, as we explain, whether a covenant running with the land or an equitable servitude, a restriction created by a single owner " 'spring[s] into existence' . . . upon an actual conveyance." (*Citizens*, *supra*, 12 Cal.4th at p. 365.)

11

defendant meets this initial burden of production, the burden shifts to the plaintiff to demonstrate the existence of a triable issue of material fact.' " [Citation.] 'From commencement to conclusion, the moving party defendant bears the burden of persuasion that there is no triable issue of material fact and that the defendant is entitled to judgment as a matter of law.' " (*Grotheer v. Escape Adventures, Inc.* (2017) 14 Cal.App.5th 1283, 1292–1293; see *Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1002-1003 [burden of persuasion remains with the party moving for summary judgment].) If the defendant fails to meet this initial burden, the burden does not shift to the plaintiff and the motion should be denied without regard to plaintiff's opposing evidence. (*Schmidt v. Citibank, N.A., supra,* 28 Cal.App.5th at p. 1119; *Jameson v. Desta* (2013) 215 Cal.App.4th 1144, 1162; *Laycock v. Hammer* (2006) 141 Cal.App.4th 25, 29.)

"On review of an order granting summary judgment, an appellate court 'independently examine[s] the record in order to determine whether triable issues of fact exist to reinstate the action.' " (*Schmidt v. Citibank, supra,* 28 Cal.App.5th at p. 1119, quoting *Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142.) On this de novo review we "consider[] all of the evidence the parties offered in connection with the motion . . . and the uncontradicted inferences the evidence reasonably supports." (*Merrill v. Navegar, Inc.*(2001) 26 Cal.4th 465, 476; *Regents of University of California v. Superior Court, supra,* 4 Cal.5th at p. 618.) "Courts deciding motions for summary judgment . . . may not weigh the evidence but must instead view it in the light most favorable to the opposing party and draw all reasonable inferences in favor of that party." (*Weiss v. People ex rel. Department of Transportation* (2020) 9 Cal.5th 840, 864.) A court may not grant summary judgment on conflicting inferences reasonably deducible from the evidence

that raise a triable issue as to any material fact. (See § 437c, subd. (c).) Nonetheless, a nonmoving plaintiff must present sufficient facts and circumstances to support an inference in its favor; it is not enough to provide speculation, conjecture or guesswork to defeat a defense summary judgment. (*Howard v. Omni Hotels Management Corp.* (2012) 203 Cal.App.4th 403, 421; *Annod Corp. v. Hamilton & Samuels* (2002) 100 Cal.App.4th 1286, 1298-1299.)

B. *Legal Requirements to Establish a Covenant Running with the Land, Equitable Servitude and Transfer of Title via Deed*

The issues presented by this appeal are assisted by a brief overview of the legal requirements for covenants running with the land under section 1468, equitable servitudes, and the effective transfer of title via deed.

1. *Covenants Running with the Land*

"A covenant running with the land is created by language in a deed or other document showing an agreement to do or refrain from doing something with respect to use of the land." (*Committee to Save Beverly Highlands Homes Assn. v. Beverly Highlands Homes Assn.* (2001) 92 Cal.App.4th 1247, 1269.) The only covenants that run with the land are those specified by statute "and those which are incidental thereto." (§ 1461.) "A covenant can run with the land under . . . section 1468." (*Self v. Sharafi* (2013) 220 Cal.App.4th 483, 488.)[7]

Section 1468 provides in part: "Each covenant, made by an owner of land with the owner of other land . . . to do or refrain from doing some act on

_____

[7] We observed in *Self v. Sharafi*, *supra*, 220 Cal.App.5th 483 that a covenant can also run with the land under section 1462, but that requires the covenant to be "contained in a grant of an estate of real property." (§ 1462.) That is not the case here.

his own land, which doing or refraining is expressed to be for the benefit of the land of the covenantee, runs with both the land owned by . . . the covenantor and the land owned by . . . the covenantee and shall . . . benefit or be binding upon each successive owner, during his ownership . . . ."[8] Section 1468 requires: "(1) the benefited and burdened lands must be particularly described in the instrument creating the covenant, either a deed between the grantor and grantee or an agreement between landowners; (2) the covenantor's successors must be expressly bound for the benefit of the covenantee's land; (3) the covenant must concern the use, repair, maintenance, or improvement of the property or the payment of taxes and assessments and (4) the agreement must be recorded." (*Oceanside Community Assn. v. Oceanside Land Co.* (1983) 147 Cal.App.3d 166, 174, fn. 4 (*Oceanside*), held to be dictum on other grounds in *Self v. Sharafi, supra,* 220 Cal.App.4th at p. 491, fn. 5; § 1468.) "The primary characteristic of a covenant running with the land is that both liability upon it and enforceability of it pass with the transfer of the estate. The benefits or

---

[8] Section 1468 provides all the following requirements must be met: "(a) The land of the covenantor which is to be affected by such covenants, and the land of covenantee to be benefited, are particularly described in the instrument containing such covenants; (b) Such successive owners of the land are in such instrument expressed to be bound thereby for the benefit of the land owned by, granted by, or granted to the covenantee; (c) Each such act relates to the use, repair, maintenance or improvement of, or payment of taxes and assessments on, such land or some part thereof, or if the land owned by or granted to each consists of undivided interests in the same parcel or parcels, the suspension of the right of partition or sale in lieu of partition for a period which is reasonable in relation to the purpose of the covenant; (d) The instrument containing such covenants is recorded in the office of the recorder of each county in which such land or some part thereof is situated."

burdens pass by implication of law rather than under principles of contract." (*Anthony v. Brea Glenbrook Club* (1976) 58 Cal.App.3d 506, 510; see § 1460.)

In *Citizens*, *supra*, 12 Cal.4th 345, the California Supreme Court addressed and rejected a claim that recorded declarations (covenants, conditions and restrictions, or CC&R's) were unenforceable when not mentioned in a deed. (*Id*. at p. 348.) The owners of property, Joseph and Claire Stadler, had signed CC&R's for land that they had subdivided for a planned community and recorded them before the sale of any of the parcels they purported to govern. (*Id*. at p. 349.) In part, the CC&R's stated that the Stadlers owned the property, and that as to them " 'and their grantees and successors in interest of any lot or lots' in the subdivision, the conditions [were] to be 'covenants running with the land' enforceable by 'the Subdividers, grantees or assigns, or by such owners or successors in interest.' " (*Id*. at p. 350.) The *Citizens* court ruled the CC&R's were enforceable: "If a declaration establishing a common plan for the ownership of property in a subdivision and containing restrictions upon the use of the property as part of the common plan is recorded before the execution of the contract of sale, describes the property it is to govern, and states that it is to bind all purchasers and their successors, subsequent purchasers who have constructive notice of the recorded declaration are deemed to intend and agree to be bound by, and to accept the benefits of, the common plan; the restrictions, therefore, are not unenforceable merely because they are not *additionally* cited in a deed or other document at the time of the sale." (*Citizens*, at p. 349, see also p. 368 ["The CC&R's of this case were recorded before any of the parcels were sold, thus providing constructive notice to subsequent purchasers; they state an intent to establish a general plan for the subdivisions binding on all purchasers and their successors; and they

15

describe the property they are to govern.  Therefore, . . . the fact that the individual deeds do not reference them is not fatal to their enforceability"].)[9]

In reaching its holding, the *Citizens* court emphasized that the issue it resolved was whether the restrictions took effect in the first place to bind the original grantees and also whether there was sufficient expression of *intent* on the purchaser's part to enter into the covenants even when they were not referenced in the written conveyance documents.  (*Citizens*, *supra*, 12 Cal.4th at p. 356.)  It detailed the many uncertainties created by the disapproved rule that a deed refer to restrictions, and explained that the new rule it announced eliminated the "bewildering mosaic" of issues concerning enforcement:  "[I]f the restrictions are recorded before the sale, the later purchaser is deemed to agree to them" and "[t]he purchase of property knowing of the restrictions evinces the buyer's intent to accept their burdens and benefits.  Thus, the mutual servitudes are created *at the time of the conveyance* even if there is no additional reference to them in the deed."  (*Id.* at p. 363, italics added.)

*Citizens* went on to state:  "The rule is consistent with the rationale of the prior cases, and would undermine no legal or policy concerns expressed in those cases.  The theoretical underpinning of the rule requiring the restrictions to be stated in the deeds is that a developer cannot unilaterally make an agreement.  It takes two parties—in this case the seller and the buyer—to agree.  Merely recording the restrictions does not create mutual servitudes.  Rather, they 'spring into existence' only upon an actual

---

[9]     The *Citizens* court explained that the law had developed in such a way that made covenants that run with the land analytically closer to equitable servitudes.  It did not reach whether they had been merged into one doctrine because the rule it announced applied to both covenants that run with the land and equitable servitudes.  (*Citizens*, *supra*, 12 Cal.4th at pp. 354, 355.)

16

conveyance. [Citation.] We agree with all this. The servitudes are not effective, that is, they do not 'spring into existence,' until an actual conveyance subject to them is made. The developer could modify or rescind any recorded restrictions before the first sale." (*Citizens*, *supra*, 12 Cal.4th at p. 365.)

2. *Equitable Servitudes*

"An equitable servitude may be created when a covenant does not run with the land but equity requires that it be enforced." (*Committee to Save Beverly Highlands Homes Assn. v. Beverly Highlands Home Assn.*, *supra*, 92 Cal.App.4th at p. 1269; *Marra v. Aetna Construction Co.* (1940) 15 Cal.2d 375, 378; *B.C.E. Development, Inc. v. Smith* (1989) 215 Cal.App.3d 1142, 1146; *Taormina Theosophical Community, Inc. v. Silver* (1983) 140 Cal.App.3d 964, 972.) "Even though a covenant does not run with the land, it may be enforceable in equity against a transferee of the covenantor who takes with knowledge of its terms under circumstances which would make it inequitable to permit him to avoid the restriction." (*Marra*, at p 378; *Taormina*, at p. 972.) This doctrine is not restricted to real estate subdivisions, but may apply to restrictions benefitting or restricting a single lot. (*Marra*, at p. 378.)

As stated, given the amendments to section 1468, the concepts of an equitable servitude and a covenant running with the land may as a practical matter have been merged. (See *Citizens*, *supra*, 12 Cal.4th at pp. 352-356.) Historically, case law required that equitable servitudes "be created by a recorded deed or written agreement between landowners; the dominant tenement to be benefited by the restrictions must be described; the intent of both parties (the common grantor and the initial grantee) to create a common general plan of restrictions must be demonstrated; and a subsequent grantee

17

must have record or actual notice of the restriction when he receives title to the property." (*Soman Properties, Inc. v. Rikuo Corp.* (1994) 24 Cal.App.4th 471, 484, disapproved on other grounds in *Citizens*, *supra*, 12 Cal.4th at p. 355.)

### 3. *Transfer of Title Via Deed*

A deed conveying real property does not transfer title to a grantee until it has been legally delivered. (See § 1054 [a grant of property "takes effect, so as to vest the interest intended to be transferred, only upon its delivery by the grantor"]; see *Miller v. Jansen* (1943) 21 Cal.2d 473, 476; *Luna v. Brownell* (2010) 185 Cal.App.4th 668, 673.)

" 'Delivery is a question of intent.' " (*Luna v. Brownell*, *supra*, 185 Cal.App.4th at p. 673, quoting *Osborn v. Osborn* (1954) 42 Cal.2d 358, 363.) "[T]o constitute a valid delivery there must exist a mutual intention on the part of the parties, and particularly on the part of the grantor, to pass title to the property immediately. In other words, to be a valid delivery, the instrument must be meant by the grantor to be presently operative as a deed, that is, there must be the intent on the part of the grantor to divest himself presently of the title." (*Henneberry v. Henneberry* (1958) 164 Cal.App.2d 125, 129.) The controlling issue is the *grantor*'s intent. (See *Huth v. Katz* (1947) 30 Cal.2d 605, 608; *Perry v. Wallner* (1962) 206 Cal.App.2d 218, 221; *Knudson v. Adams* (1934) 137 Cal.App. 261, 267.) " '[A] valid delivery [of a deed] is accomplished when the conduct and acts of a grantor manifest a present intent to dispose of the title conveyed by the deed. No particular form of delivery is necessary; but any act or thing which manifests such an intent is sufficient to establish it.' . . . [However,] the transfer of possession must be with the intent of presently passing title, and must not be hampered by the reservation of any right of revocation or recall." (*Follmer v. Rohrer*

18

(1910) 158 Cal. 755, 757-758; see also *Danenberg v. O'Connor* (1961) 195 Cal.App.2d 194, 201-202.)  A manual transfer is not conclusive evidence of such intention; the grantor's possession of the deed and his exercise of dominion and control of the property after manual transfer may be considered in determining intent to presently pass title.  (*Huth*, at p. 608.) Intent is so important that " '[e]ven if the document is manually delivered, but the evidence shows that the parties or the grantor intended the document to become operative only upon death, the document is testamentary in character and void as a deed.' "  (*Gonzales v. Gonzales* (1968) 267 Cal.App.2d 428, 435-436, quoting *Henneberry*, at p. 129.)  A deed that is not validly delivered is void.  (*Bank of Healdsburg v. Bailhace* (1884) 65 Cal. 327, 328; *Meyer v. Wall* (1969) 270 Cal.App.2d 24, 27.)

Delivery or absence of delivery of a deed is always a question of fact to be found from the surrounding circumstances of each transaction.  (*Hotaling v. Hotaling* (1924) 193 Cal. 368, 382; *Donahue v. Sweeney* (1915) 171 Cal. 388, 391; *Blackburn v. Drake* (1963) 211 Cal.App.2d 806; *Perry v. Wallner, supra*, 206 Cal.App.2d at p. 221 [determination of whether the grantor intended to be immediately divested of title—and therefore delivered the deed—is a question of fact to be determined by the trial court from a consideration of all the evidence].)  Acceptance by the grantee, which is necessary to make a delivery effective, is likewise a question of fact.  (*Luna v. Brownell, supra*, 185 Cal.App.4th at p. 673; *Perry*, at p. 222.)

A number of presumptions and inferences bear on the question of delivery.  Section 1055 provides: "A grant duly executed is presumed to have been delivered at its date."  Properly understood, this presumption pertains only to the date, not to the fact, of delivery, which must be independently proved.  (*Miller v. Jansen, supra*, 21 Cal.2d at p. 476 ["A duly signed *and*

19

*delivered instrument* is presumed to have been delivered at its date," italics added]; *20th Century Plumbing Co. v. Sfregola* (1981) 126 Cal.App.3d 851, 853; *Blackburn v. Drake, supra,* 211 Cal.App.2d at p. 812.)  Recordation of a deed creates a rebuttable presumption of valid delivery.  (See Evid. Code, § 1600; *Butler v. Butler* (1961) 188 Cal.App.2d 228, 233 ["recordation at the request of the grantor constitutes prima facie evidence of delivery with intent presently to convey the interest set forth in the deed"].)  Similarly, possession of an executed deed by a grantee creates an inference of legal delivery.  (*Blackburn,* at pp. 811-812.)  In contrast, the failure to record a deed does not preclude a finding of delivery; it is simply one circumstance to be taken into account in determining whether the grantor intended the deed to be presently operative.  (*Gonzales v. Gonzales, supra,* 267 Cal.App.2d at p. 436 & fn. 7.)

All of these presumptions and inferences are rebuttable and may be overcome by contrary evidence.  (*Henneberry v. Henneberry, supra,* 164 Cal.App.2d at p. 129; *Blackburn v. Drake, supra,* 211 Cal.App.2d at pp. 812-813; accord, *California Trust Co. v. Hughes* (1952) 111 Cal.App.2d 717, 719 [once presumption is established burden shifts to the party attacking the validity of the deed to rebut the presumption]; 3 Miller & Starr, Cal. Real Estate (4th ed. 2020) § 8.42, p. 8-10.)  Ultimately, "[b]ecause the issue of the legal delivery of the instrument is factual, none of the factors that bear on the issue is conclusive.  Each must be weighed in view of all the other matters relevant to the final determination of the question."  (3 Miller & Starr, Cal. Real Estate, *supra,* § 8.42, p. 8-10.)

C.  *Contentions*

20

Plaintiffs contend the trial court erred and made inconsistent factual rulings when it invalidated the March 1980 declaration on its reasoning that neither Kravis/O'Connor and Peterson/O'Connor were the owners, respectively, of the San Antonio and Owen  properties, at the time they signed it.  Plaintiffs' positions on this point are as follows:  First, they argue that assuming defendants are correct that Kravis/O'Connor obtained title to the San Antonio property in February 1980 when RPTDC signed the deed to them, then the March 1980 declaration is valid and enforceable because the law, specifically, *Oceanside*, *supra*, 147 Cal.App.3d 166, requires only the grantor or covenantor—here Kravis/O'Connor—and not both parties, to sign such declarations.  Under this argument, because Kravis/O'Connor signed the March 1980 declaration and it was recorded, giving defendants both constructive and actual notice, it was valid from its inception and enforceable against defendants.  Second, plaintiffs argue that, contrary to the trial court's ruling, Kravis/O'Connor did not in fact become record owners of the San Antonio property until February 1981, when the prior deed was recorded, and thus RPTDC, the record legal owner of that property, validly cured the defect in the earlier declaration by later entering into the April 1980 declaration, which incorporated the March 1980 declaration by reference.[10]

---

[10]    Plaintiffs further contend any deficiencies in the March 1980 declaration were cured by operation of law under the after-acquired title doctrine, which validated the March 1980 declaration when Kravis/O'Connor subsequently acquired record title to the San Antonio property.  Plaintiffs concede they did not raise the after-acquired title doctrine in the trial court, but maintain it is a question of law on undisputed facts that may be raised for the first time on appeal.  We agree with defendants; plaintiffs may not raise an after-acquired title theory for the first time on appeal.  (*Schmidt v. Citibank, N.A.*, *supra*, 28 Cal.App.5th at p. 1125; *North Coast Business Park v. Nielsen Construction Co.* (1993) 17 Cal.App.4th 22, 29.)

21

Defendants respond that the trial court's ruling was not inconsistent; that section 1468 requires the covenantor and covenantee be the owners of the land, and at the time the March 1980 declaration was signed, RPTDC, not Peterson/O'Connor, owned the Owen property. They maintain *Oceanside*, *supra*, 147 Cal.App.3d 166 is inapposite and irrelevant in part because it was decided under a previous version of section 1468, and the covenant in that case was made pursuant to an agreement between the covenantor and covenantee. Defendants argue *Oceanside* did not change the requirement that "restrictions on the use of land cannot be created unilaterally by a single landowner."

As for the April 1980 declaration, plaintiffs' maintain, among other arguments, the trial court failed to properly apply presumptions as to the fact and date of delivery of the deed to the San Antonio property, and the effect of that declaration's recording. Defendants respond that the court correctly ruled the April 1980 declaration was invalid because RPTDC had already transferred title to Kravis/O'Connor and did not own the San Antonio property when it signed and recorded that declaration. They argue plaintiffs offered only speculation to rebut the presumption that title passed to Kravis/O'Connor upon execution of the deed. Finally, defendants argue based on *Citizens*, *supra*, 12 Cal.4th 345 that even if RPTDC owned the San Antonio property in April 1980, it could not enter into binding restrictions with itself.

D. *The Evidence Presents Conflicting Inferences Precluding Summary Judgment on the Validity of the Declarations as Covenants Running With the Land or Equitable Servitudes*

Resolution of the parties' arguments cannot be divorced from the summary judgment context. In these circumstances, the trial court's

reasoning is irrelevant; we owe it no deference and review the ruling not the rationale. (*Coral Construction, Inc. v. City and County of San Francisco* (2010) 50 Cal.4th 315, 336; *Navarrete v. Meyer* (2015) 237 Cal.App.4th 1276, 1283.) Second, it is not our function (nor was it the trial court's) to resolve issues, but merely to determine first whether defendants established they were entitled to a judgment as a matter of law, and if so, whether the evidence gave rise to triable issues of material fact for a jury on the question of the declarations' validity. The validity of the declarations here depend on ownership of the properties, which in turn depends on whether the February 1980 deed effectively transferred title from RPTDC to Kravis/O'Connor.

As we shall explain, the evidence permits conflicting inferences as to whether RPTDC remained the owner of the San Antonio property after February 1980. If RPTDC remained the owner, then the April 1980 declaration, which incorporated the March 1980 declaration and was signed by RPTDC as both covenantor and covenantee and recorded, is an enforceable covenant or equitable servitude binding on defendants, who purchased the San Antonio property with actual notice of that restriction. Because on this record defendants did not meet their threshold burden, we must reverse the summary judgment.

1. *Section 1055 Is Not a Presumption of Delivery*

As stated, whether a deed has been delivered is a question of fact turning on the grantor's intent. (§ 1054; *Huth v. Katz*, *supra*, 30 Cal.2d at p. 608; *Luna v. Brownell*, *supra*, 185 Cal.App.4th at p. 673.) In their summary judgment motion, defendants argued the March 1980 declaration was invalid because Peterson/O'Connor did not own the Owen property when they executed it, and did not meet section 1468's requirement that owners enter into the restrictions. As to the April 1980 declaration, they argued RPTDC

23

likewise did not own the San Antonio property; that the grant deed from RPTDC to Kravis/O'Connor was executed in February 1980 and delivered "as of the date it was executed." Defendants thus did not focus on evidence of the intent of RPTDC or its president, but invoking a purported presumption of delivery under section 1055, argued that title from RPTDC to Kravis/O'Connor transferred in February 1980 because the deed was delivered upon its "execution" and thus Kravis/O'Connor owned the San Antonio property at the time RPTDC purported to sign the April 1980 declaration as covenantor.

Defendants misunderstand the section 1055 rebuttable presumption. As stated above, it is settled that it pertains only to the date of delivery, not the fact of delivery (*Miller v. Jansen*, *supra*, 21 Cal.2d at p. 476), and thus a "duly signed *and delivered* instrument is presumed to have been delivered at its date." (*Blackburn v. Drake*, *supra*, 211 Cal.App.2d at p. 812.) *Miller* interpreted statutes to reach that conclusion, pointing out that under Code of Civil Procedure section 1933, "execution imports delivery" and the presumption arises when there is a "duly executed" grant, that is, "one which has been signed *and delivered* . . . ." (*Miller*, at p. 476 ["Obviously then, a grant has not been executed ([Code Civ. Proc.,] § 1933 . . .) and cannot take effect ([Civ. Code,] § 1954 . . .) until it has been signed and delivered"].)[11] Defendants wrongly equated execution with mere subscribing.

_____

11      As *Miller* pointed out, Code of Civil Procedure section 1933 states that " 'the execution of an instrument is the subscribing and delivering it, with or without affixing a seal.' " (*Miller v. Jansen*, *supra*, 21 Cal.2d at p. 476.) A presumption is not operative until basic facts are established that give rise to the presumption. (Evid. Code, § 600 [a presumption is not evidence; it is merely an assumption of fact that the law requires to be made from another fact or group of facts found or otherwise established]; *Butler v. LeBouef* (2016) 248 Cal.App.4th 198, 211.)

Delivery must be shown as a preliminary fact before the section 1055 presumption may be invoked.  The court in *Blackburn v. Drake* explained: "[T]he interpretation of *Miller* is that *once delivery in fact is established* a presumption attaches that the deed was delivered on the date it bears.  As to the fact of delivery, says *Miller*, possession by the grantee gives rise to an *inference* that the instrument was duly delivered.  It would appear, therefore, that *Miller* has finally settled the confusion by deciding that possession raises an inference rather than a presumption.  [Citations.]  We thus have in the law of our state a statutory presumption as to the date of delivery of an instrument, and a nonstatutory inference as to the fact of delivery of the instrument where it is in the possession of the grantee.  Whatever the niceties of the law be as between a presumption and an inference insofar as the kind or amount of evidence necessary to dispel such presumption or inference, it is settled law that the inference of delivery and the presumption of date of delivery are rebuttable and in the face of contrary evidence become considerations of fact for the trial court or jury to determine." (*Blackburn v. Drake, supra*, 211 Cal.App.2d at pp. 812-813, italics added.)

It was defendants' threshold burden on summary judgment to make a "prima facie showing of the nonexistence of any genuine issue of material fact." (*Aguilar v. Atlantic Richfield Co., supra*, 25 Cal.4th at p. 845.)  In this context, defendants' burden was to "present evidence that would preclude a reasonable trier of fact from finding . . . it was more likely than not . . . the material fact [that the February 1980 deed was not delivered to Kravis/O'Connor in February 1980, and RPTDC therefore remained the owner of the San Antonio property] was true" (*Kahn v. East Side Union High School Dist., supra*, 31 Cal.4th at p. 1003) or that plaintiffs " '[did] not possess and [could not] reasonably obtain' " (*ibid*) evidence of that material fact.

25

Here, this burden was not met by defendants' reliance on the section 1055 presumption and their argument it compelled a finding as a matter of law that delivery of the San Antonio deed to Kravis/O'Connor occurred upon signing. "The mere signing of the deed by the grantor and a witness and acknowledgment by the grantor are not sufficient to divest the grantor of title. Delivery is essential." (*Miller v. Jansen, supra*, 21 Cal.2d at p. 476.) Defendants did not present evidence to establish who actually physically possessed the San Antonio property deed and when, so as to raise an inference of delivery. (*Blackburn v. Drake, supra*, 211 Cal.App.2d at pp. 812-813.) The sole evidence from which a possible inference of physical possession may be drawn is the notation on the deed from RPTDC to Kravis/O'Connor stating it was to be mailed to Kravis/O'Connor "when recorded," which occurred in February 1981. The deed itself permits only an inference in plaintiffs' favor that Kravis/O'Connor did not physically possess it until February 1981.

The summary judgment burden thus never shifted to plaintiffs to rebut an inference of delivery in February 1980, because defendants never made out a prima facie case entitling them to summary judgment. The evidence permits nonspeculative inferences as to RPTDC's intent. "In some cases to ascertain the grantor's intent it is necessary to have recourse to his acts and declarations both before and after his transmission of the deed to the grantee or a third party." (*Osborn v. Osborn, supra*, 42 Cal.2d at pp. 363-364.[12])

---

[12] In *Osborn v. Osborn, supra*, 42 Cal.2d 358, the court explained that if the grantor's instructions are in writing, delivery will depend on an interpretation of that document; in that instance, whether there was an absolute delivery becomes a pure question of law. (*Id.* at p. 364.) There is no evidence RPTDC put any instructions in writing as to delivery of the deed to Kravis/O'Connor apart from directing it to be mailed to them upon recordation as stated above.

" 'When intent is a material element of a disputed fact, declarations of a decedent [grantor] made after as well as before an alleged act that indicate the intent with which he performed the act are admissible in evidence as an exception to the hearsay rule, and it is immaterial that such declarations are self-serving. Thus, in cases involving the delivery of deeds, declarations of the alleged grantor made before and after the making of the deed are admissible upon the issue of delivery, and it is immaterial that such declarations are in the interest of the party producing them.' " (*Dinneen v. Younger* (1943) 57 Cal.App.2d 200, 207.) The grantee's conduct is also relevant to assess whether a valid delivery has occurred. "When a grantor or a grantee subsequently deals with the property in a manner inconsistent with the theory of an effective delivery, such fact is of considerable importance in determining their probable intent." (*Ibid.*.)

Here, the documents show RPTDC did in fact deal with the property in a manner inconsistent with a conclusion that the deed signed in February 1980 was delivered to Kravis/O'Connor in February 1980. RPTDC's contrary intent is shown by the fact it later signed the April 1980 declarations as the "record legal owner," apparently without objection from Kravis/O'Connor, then did not record the February 1980 deed until a year later, in February 1981. RPTDC's declaration that it was the owner of the San Antonio property raises a nonspeculative inference of RPTDC's intent to retain dominion and control, and that it considered itself the owner of the San Antonio property as of April 1980. Further, the deed recites that after recording it is to be mailed to Kravis/O'Connor, suggesting that delivery and transfer of title to Kravis/O'Connor did not occur until February 1981. The nonspeculative inferences drawn from the documents alone raise a material fact question for a jury as to when RPTDC intended to presently pass title,

27

precluding summary judgment. As stated, defendants did not present direct evidence the deed was physically transferred to Kravis/O'Connor at any time before April 1980.

2. *Defendants Did Not Establish Prima Facie that The April 1980 Declaration is Not a Valid Covenant or Equitable Servitude*

RPTDC signed the April 1980 declaration as both covenantor and covenantee, and as owner of both the burdened San Antonio property and benefitted Owen property. The April 1980 declaration attached the March 1980 declaration, which contained detailed descriptions of both properties. The April 1980 declaration provides it "adopts the [March 1980 declaration] and agrees for itself, its successors and assigns, whether voluntary or involuntary, to be bound thereby, it being expressly understood and agreed that the conditions and restrictions contained in said Declaration of Restrictions shall operate as covenants running with the land, and that a breach of any of said conditions and restrictions or the continuance of any such breach may be enjoined, abated or remedied by appropriate equitable and/or legal proceedings by the owners of the benefited property." The April 1980 declaration was recorded that same month in San Diego County. The law permits parties to incorporate by reference into their contract the terms of some other document, but each case turns on its facts, and the terms of the incorporated document must be known or easily available to the contracting parties. (*Baker v. Osborne Development Corp.* (2008) 159 Cal.App.4th 884, 895.) Whether this was a valid incorporation by reference is likewise a question of fact. (*Ibid.*)

Under these circumstances, defendants failed to establish entitlement to summary judgment on the theory that the April 1980 declaration could not meet the section 1468 requirements of a covenant running with the land or

28

was not an enforceable equitable servitude. The April 1980 declaration is made "by an owner of land with the owner of other land," the affected land is "particularly described" in the declaration, it provides that successive owners of the land are to be bound for the benefit of the covenantee's land, the height restriction "relates to the use" of the covenantor's land, and the instrument was recorded "in the office of the recorder of each county in which such land or some part thereof is situated." (§ 1468.) It is a writing intended to restrict use of the San Antonio property for the benefit of the Owen property's owner and successors, and defendants acquired the San Antonio property with actual notice of the restriction. Nothing in the evidence suggests it would be inequitable to enforce the declaration against defendants as a matter of law.

3. *Defendant's Separate Ownership Argument Is Without Merit*

Defendants asserted in their motion that even if RPTDC owned the San Antonio property at the time its president signed the April 1980 declaration, that declaration is not enforceable because an enforceable covenant requires "separate ownership." They argued: "RPTDC could not enter into binding restrictions with itself by way of contractual Declaration of Restrictions that were not included as part of a deed restriction within a grant deed." Defendants rely solely on a statement in *Citizens* that "[r]estrictions on the use of land cannot be created unilaterally by a single landowner."

To the extent defendants argue that a valid declaration must be included "as part of a deed restriction within a grant deed," that position was squarely rejected by *Citizens*, *supra*, 12 Cal.4th 345, as discussed above. To be valid, the covenant must be recorded before a sale, but it need not be referenced or included in the deed that transfers title. (*Id*. at pp. 349, 363.) The other statement from *Citizens* on which defendants rely is taken out of the context in which it was made. One of the two sets of declarations the

29

*Citizens* court found valid was created by a single owner, the Stadlers, and recorded before any sales of the properties they had subdivided. (*Citizens*, at pp. 349-350.) The referenced statement was the court's explanation that a restriction created under single ownership "spring[s] into existence" when a conveyance is made subject to the restriction.[13] Here, that would have occurred—the April 1980 covenant came into existence—when RPTDC, the common owner of both parcels, transferred title of the San Antonio property to Kravis/O'Connor in February 1981. Defendants admit they purchased the San Antonio property with actual knowledge of the restriction.

In sum, on this record the question of when the San Antonio property deed from RPTDC to Kravis/O'Connor was delivered—particularly the question of RPTDC's intent to presently divest itself of title—is subject to competing inferences and thus one of fact not amenable to summary judgment. As we have explained, if RPTDC remained the owner of the San Antonio property after February 1980, then the April 1980 declaration, which

---

13     This could occur when a real estate developer creates and records a declaration of restrictions, then subdivides and sells parcels subject to the declaration. But section 1468 is not restricted to those circumstances, and a servitude can arise when a common owner of adjoining parcels creates the servitude. (See Rest.3d Property, Servitudes (2020) § 2.1, com. b, illus. 1, ["O, the owner of Blackacre and Whiteacre, executed and delivered a deed to A conveying fee simple in Whiteacre, together with an easement across Blackacre for access to the highway abutting Blackacre. A servitude burdening Blackacre and benefiting Whiteacre was created"]; e.g., *Self v. Sharafi, supra*, 220 Cal.App.4th at pp. 486-487 [restriction created by single owner of adjoining lots was a covenant running with the land under section 1462]; accord, *Marra v. Aetna Construction, supra*, 15 Cal.2d at p. 378 [doctrine of equitable servitudes is not limited to restrictions imposed pursuant to a general plan for improving an entire tract or real estate subdivision, but may be enforced though they benefit or restrict only a single parcel of land]; *Dudek v. Dudek* (2019) 34 Cal.App.5th 154, 166 [applying principles in Restatement Third of Property].)

incorporated the March 1980 declaration and was signed by RPTDC as both covenantor and covenantee then recorded, is an enforceable covenant running with the land or equitable servitude binding on defendants, who purchased the San Antonio property with actual notice of that restriction.

Our inquiry is over once we have determined there are issues of fact precluding summary judgment in defendants' favor. We need not pass on the remaining questions, including as to the enforceability of the March 1980 declaration standing alone.

## DISPOSITION

The judgment is reversed. Plaintiffs shall recover their costs on appeal.


O'ROURKE, J.

WE CONCUR:



McCONNELL, P. J.



HALLER, J.